JUSTICE TRIEWEILER
concurring in part and dissenting in part.
I concur with the majority’s conclusions under Issues I and II.
I dissent from the majority’s conclusions under Issues III and IV.
However, it is not necessary to conclude that the arbitration clauses at issue are contracts of adhesion, nor that they were induced by fraud. Neither federal nor state law permits enforcement of any provision so broad as the arbitration agreements relied on in this case. In fact, I conclude that the arbitration clauses in plaintiffs’ contracts with Piper, Jaffray & Hopwood, Inc., are void by reason of the fact that they violate public policy in the State of Montana. To explain why that conclusion is necessary, further factual background is helpful.
The arbitration clauses relied on by PJH and enforced by the majority’s decision were included in two co-owner account agreements signed by plaintiff Marlene Chor. The first agreement was entered into among PJH, Marlene Chor, and her husband, John Michael Chor, on June 17, 1988. It related only to PJH account number 730-194699-500. Its purpose was to authorize either of the co-owners of that account to deal with PJH individually and provided that each co-owner would be bound by the actions and decisions of the other with regard to that account.
*155 The second co-owner account agreement was entered into among PJH, Marlene Chor, and her son, John Martin Chor. It related to PJH account number 730-194696-500. Its purpose was the same as the previous co-owner account agreement, but related to a different account owned by different parties.
The fact that the two agreements were separate agreements relating to different subject matters and involving different parties is evident from the fact that two separate agreements were required by PJH.
Referring to the two co-owner account agreements and the margin agreement in its appellate brief, PJH’s attorneys correctly pointed out that “[e]ach agreement is a separate document, executed at a different time. The three agreements created three separate and distinct accounts with different account numbers. Even the parties are different.”
The cause of action which is the subject of this appeal is based on plaintiffs’ allegation that John Schultz, while employed by PJH, sold Marlene Chor and her brother, Martin Andre, unregistered Terran Partnership investments in violation of the Montana Securities Act. This transaction was unrelated to any of the three accounts for which Marlene Chor had signed co-owner account agreements or a margin agreement. In fact, it is PJH’s position that it neither underwrote nor marketed the Terran Partnership securities and that Schultz was unauthorized by PJH to sell them.
The point of all this background is that PJH is relying on an arbitration provision in three account agreements to compel arbitration of a dispute arising out of a transaction which is unrelated to any of those accounts, and therefore, unrelated to those specific agreements.
According to PJH, because the arbitration provision in its co-owner account agreements is so broad, once Marlene Chor signed them, she became bound to arbitrate every future dispute with PJH, regardless of the basis for that dispute. In other words, based on the arbitration agreement in the co-owner account agreements, if one of PJH’s secretaries ran over Marlene Chor while she was a pedestrian crossing a Butte city street with a green light and a dispute arose over liability for that collision, Marlene Chor would be bound to arbitrate that dispute and would be denied her right of access to Montana’s courts and her right to a jury trial.
To approve enforcement of an arbitration provision so broad, under the circumstances in this case, is unconscionable and shows a blatant *156 disregard for the importance of access to our courts and the jury system.
The public policy in Montana is clearly set forth at § 28-2-708, MCA, where it provides that:
Every stipulation or condition in a contract by which any party thereto is restricted from enforcing his rights under the contract by the usual proceedings in the ordinary tribunals or which limits the time within which he may thus enforce his rights is void. This section does not affect the validity of an agreement enforceable under Title 27, chapter 5.
Title 27, chapter 5, is known as Montana’s Uniform Arbitration Act. Section 27-5-114, MCA, of the Act provides that with some exceptions, an agreement to submit a controversy to arbitration is a valid and enforceable agreement. However, an important qualification is found in subsection (4) which provides:
Notice that a contract is subject to arbitration pursuant to this chapter shall be typed in underlined capital letters on the first page of the contract; and unless such notice is displayed thereon, the contract may not be subject to arbitration.
Neither of the two co-owner account agreements complied with this requirement. However, more importantly, a contract to purchase an interest in the Terran Partnership was a separate agreement for which no notice whatsoever was given that plaintiff would be required to arbitrate disputes arising from that transaction.
It is correct that, to the extent Montana’s public policy requiring a judicial forum for the resolution of claims is inconsistent with federal policy, Montana’s policy is preempted. Southland Corp. v. Keating (1984), 465 U.S. 1, 104 S. Ct. 852, 79 L. Ed. 2d 1. However, the Federal Arbitration Act is not inconsistent in this respect.
Piper, Jaffray & Hopwood concedes that the Federal Act’s starting point for determining whether this claim must be arbitrated is found at 9 U.S.C. § 2 (1925). That section provides, in relevant part, as follows:
A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. [Emphasis added].
*157 All that is authorized by § 2 of the Federal Arbitration Act is a contract provision requiring arbitration of disputes which arise from the contract which includes the arbitration provision. There is nothing in the Federal Arbitration Act which allows a party to a contract to include in that contract the requirement that the other party to the contract submit every future dispute between the parties to arbitration regardless of whether the future dispute relates to the contract in question. To include such a sweeping provision in a contract of adhesion, like the one in question, is simply unconscionable.
While on the subjects of adhesion and unconscionability, it is important to take a look at this Court’s previous analysis of brokerage agreements in the context of the District Court’s findings in this case.
In Passage v. Prudential-Bache Securities, Inc. (1986), 223 Mont. 60, 727 P.2d 1298, we cited with approval the following rule from Finkle and Ross v. A.G. Becker Paribas, Inc. (D.C.N.Y. 1985), 622 F. Supp. 1505, 1511-12:
Contracts of adhesion arise when a standardized form of agreement, usually drafted by the party having superior bargaining power, is presented to a party, whose choice is either to accept or reject the contract without the opportunity to negotiate its terms, (citation omitted.) Here, the investor is faced with an industrywide practice of including Arbitration Clauses in standardized brokerage contracts. As the investor faces the possibility of being excluded from the securities market unless he accepts a contract with such an agreement to arbitrate, such clauses come within the adhesion doctrine.
Passage, 727 P.2d at 1301.
The District Court made the following findings of fact which satisfy the above legal criteria of an adhesion contract:
19. ... The co-owner account agreement was drafted by PJH, printed on PJH form, and filled out by Schultz....
20. Schultz presented the co-owner account agreement to her representing that it was necessary to sign it in order to open the account. Chor was given no alternative to signing.
21. O’Neil further testified that the customer had no choice in agreeing to arbitration. If a customer refused to so agree, O’Neil said he would refuse to accept the account. He stated the customer would “go down the road” and do business elsewhere.
The above findings are supported by substantial evidence. They clearly satisfy the requirements for an adhesion contract, as set forth *158 above. By finding that this contract was not a contract of adhesion, the majority simply retried that issue of fact.
Establishment of an adhesion contract is, however, not the end of our inquiry. The rule cited in Passage goes on to provide:
However, mere inequality in bargaining power does not render a contract unenforcible [sic], (citation omitted) nor are all standardized contracts unenforcible [sic], (citations omitted.) As a consequence of current commercial realities, form forum clauses will control, absent a strong showing it should be set aside, (citation omitted.) For such a contract or clause to be void, it must fall within judicially imposed limits of enforcement. It will not be enforced against the weaker party when it is: (1) not within the reasonable expectations of said party or (2) within the reasonable expectations of the party, but, when considered in its context, is unduly oppressive, unconscionable or against public policy.
Passage, 727 P.2d at 1301-02. While the arbitration agreements in Passage andFinkle were found to be within the investor’s expectation and consistent with public policy, the arbitration provisions in this case were neither. In this regard, the District Court made the following findings, which were supported by substantial evidence:
21. Marlene Chor testified that she understood the purpose of this co-owner account agreement (Chor’s Exhibit No. 4) was to create a joint account.
27. The document, on its face, is called a co-owner account agreement. The “important notice: please read carefully” notice on the front page deals entirely with the type of account. The identification of the name of the account on the front page was printed by someone else.
28. On the third page of the agreement (Chor’s Exhibit No. 4), there appears a paragraph entitled “arbitration:” in the following language:
[Agreement deleted].
29. The insertion of the arbitration provision in the co-owner account agreement alters the stated purpose of the document from a joint account agreement to one establishing a joint account and requiring arbitration of “all controversies which may arise ....”
30. Schultz did not point out or explain what the arbitration clause meant. There is nothing on the front page of the co-owner account agreement which indicates that the document contains an *159 arbitration clause. Nor is there anything on the signature page of the document which indicates that the document contains an arbitration clause.
31. Marlene Chor testified that she thought the effect of the arbitration clause was that if there were a dispute that they would first negotiate it. As a lay person, Marlene Chor interpreted the provision as merely one step in the process prior to court action. She did not understand that it meant she was waiving her right to the courts and a jury trial.
32. Furthermore, the co-owner account agreement does not state anywhere that she waived her right to a jury trial.
33. Holland admitted in testimony that it would take someone with legal training or actual experience with arbitration to discern from the agreement that its effect is to waive due process through the Montana court, including the right to a jury trial. Yet, PJH apparently still expected the customer to sign an agreement containing an arbitration clause.
34. Both PJH’s branch manager, Tom O’Neil, and Chor’s current personal account representative, Mike Holland, testified that they were not attorneys and therefore could not explain how the arbitration clause required waiving the right to a jury trial but that they were aware that through their own experience that is the effect.
35. PJH has stipulated in the record that Chor had no input in drafting the co-owner account agreements she signed. PJH took advantage of their superior bargaining position with regard to Chor in that, as the drafter of the document, PJH knew that the effect of the document was to accomplish more than to set up a joint account. Yet, PJH failed to inform Chor of that effect of the document and now seeks to take advantage to the detriment of Chor of their superior bargaining power and knowledge which was not revealed by either their agent or the document itself. Now, PJH wishes to deny Chor the right to seek relief in the Montana courts.
The District Court clearly found that the result of the arbitration provision, which the maj ority enforced, was not within the reasonable expectations of Marlene Chor. Those findings were supported by substantial evidence. Therefore, according to this Court’s prior authority, the arbitration clause is not enforceable. Even if the clause had been found to be within Marlene Chor’s reasonable expectations, it would not be enforceable under the authority of Finkle and Passage *160 because it was unconscionable and against public policy for the reasons set forth previously.
As a result of the majority’s decision in this case, an unsophisticated member of the consuming public can sign a form agreement prepared by a large corporation with superior bargaining power, assuming that it relates to a limited transaction, and later find that they have lost all future rights of access to Montana’s courts in any future disputes with that corporation, no matter how totally unrelated to the subject of the original contract.
With court dockets being as overcrowded as they are, the rush of the federal judiciary and this Court to embrace arbitration is understandable. However, the majority’s willingness to, in the process, ignore fundamental constitutional rights such as access to our courts and the right to jury trial, is not so understandable. For these reasons I dissent from the majority opinion.
I also conclude that the District Court correctly found that Marlene Chor was induced by constructive fraud to enter into these arbitration agreements, because PJH breached its duty to properly inform her of the consequences of the agreement. However, because I conclude that the arbitration provisions are unenforceable based on the above discussion, I feel it is unnecessary to discuss further that part of the majority opinion.
JUSTICE HUNT joins in the foregoing concurrence and dissent.